## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ERIC L. BULLOCK,**<br><br>    **Plaintiff,**<br><br>  **v.**<br><br>**MEGAN BRENNAN,**<br>**POSTMASTER GENERAL,**<br><br>    **Defendant.** | **Civil Action No. 13-1543 (RDM)** |

## <u>MEMORANDUM OPINION</u>

Plaintiff Eric L. Bullock is a former United States Postal Service mail carrier.  As relevant here, Plaintiff's *pro se* complaint, construed liberally, alleges discrimination and retaliation claims against the Postmaster General[1] under Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*., which prohibits federal employers from discriminating on the basis of disability or retaliating against employees who engage in protected conduct.  Plaintiff alleges that after he broke his left ankle in 2000, he was "targeted for removal" and ultimately fired in 2010 because he "could no longer deliver [his] route in the timely manner that was expected of [him]."  Dkt. 1 at 3.  He also alleges that he was terminated in retaliation for having filed numerous Equal Employment Opportunity ("EEO") complaints against various Postal Service supervisors over the years.  *Id.* at 3–4.  Defendant responds that she fired Plaintiff because he was incarcerated for 45 days and "tried to cover it up" by submitting "two fraudulent

---

[1]   Current Postmaster General Megan Brennan is substituted for former Postmaster General Patrick R. Donohoe pursuant to Fed. R. Civ. P. 25(d).

medical notes to cover his absence," and that Plaintiff's termination was not based on disability or prior EEO activity.  Dkt. 33 at 18.

The matter is currently before the Court on Defendant's Motion to Dismiss and for Summary Judgment.  Dkt. 33.  Defendant seeks: (1) dismissal based on Plaintiff's conduct during discovery, Dkt. 33 at 12; (2) dismissal of the complaint as untimely, *id.* at 7–8; and (3) summary judgment on the merits, *id.* at 12–24.  For the reasons explained below, Defendant's motion to dismiss is **DENIED**, and her motion for summary judgment is **GRANTED**.

## I.  BACKGROUND

### A. Disability and Prior EEO Activity

Plaintiff was employed as a letter carrier from February 1985 until his termination in July 2010.  Dkt. 33-21 at 7.  Most recently, he worked at the Postal Service's Ward Place Station in the District of Columbia.  Dkt. 33-18 at 2 (Hubbard Decl. ¶ 3).  It is undisputed that Plaintiff injured his ankle on the job in 2000, but the supervisors at Ward Place who were directly involved in the events leading to his termination—his immediate supervisor, Todd Dickens, and his second-level supervisors, Acting Customer Services Manager Bryant Hubbard and Customer Services Manager Ricky Rucker—all aver that they lacked any knowledge that this injury continued to affect Plaintiff in 2009 and 2010 or that there were any medical restrictions on his work during that period.  Dkt. 33-19 at 3 (Dickens Decl. I ¶¶ 7–8); Dkt. 33-18 at 2 (Hubbard Decl. ¶¶ 2–4); Dkt. 33-20 at 1–2 (Rucker Decl. I ¶¶ 2, 7).  Plaintiff responds with unsworn assertions that at least some supervisors were aware of his medical problems.  Dkt. 35 at 17, 22–25.

From 2003 to 2009, prior to the removal decision at issue in this case, Plaintiff filed eleven EEO complaints.  Dkt. 33-3.  The record lacks information about the substance of those complaints, but it does reflect that Hubbard was aware that Plaintiff had filed complaints against

him, including naming Hubbard as a responsible official in an EEO complaint as recently as February 2009. Dkt. 33-18 at 2 (Hubbard Decl. ¶ 5). Dickens and Rucker, however, aver that until the filing of the complaint in this case, they were unaware of Plaintiff's prior EEO activity. Dkt. 33-19 at 3 (Dickens Decl. I ¶ 9); Dkt. 33-20 at 2 (Rucker Decl. I ¶ 6). There is no evidence in the record, moreover, that Plaintiff filed an EEO complaint at any time in the year and a half between February 2009, *e.g.*, Dkt. 33-18 at 2 (Hubbard Decl. ¶ 5), and May 10, 2010, when he was issued a notice of removal, Dkt. 33-3 at 1; Dkt. 33-6 at 1.

**B. Incarceration and Purported Medical Excuse**

In 2008, Plaintiff was convicted of driving under the influence ("DUI") and sentenced by the Circuit Court of Maryland for Baltimore City to a one-year suspended sentence and eighteen months' probation. Dkt. 33-4 at 21. On July 3, 2009, Plaintiff was charged with possession of marijuana, Dkt. 33-4 at 22, and although Plaintiff states that he was ultimately found not guilty of that charge, Dkt. 33-9 at 2, the Circuit Court revoked his probation on October 23, 2009, and sentenced him to 90 days' incarceration for the DUI conviction, beginning immediately. Dkt. 33-4 at 24.

On October 23, 2009, Plaintiff informed a supervisor at the Ward Place Station that he would be absent for the next month. Dkt. 33-18 at 2 (Hubbard Decl. ¶ 7). The same day, "[t]he Ward Place Station received a faxed medical document stating that [Plaintiff] would not return to work until November 23, 2009, because he had reinjured his ankle." *Id.* The medical excuse was sent by "Dr. G.K. Bharati, M.D., P.A.," and listed an address in Essex, Maryland. Dk. 33-4 at 10. Dr. Bharati reported that Plaintiff "was seen in my office today," that Plaintiff had "re-injured his left ankle and will be out of work from October 23 through November 23, 2009," and that a "follow-up appointment [was] scheduled for November." *Id.* Hence, "plaintiff's absences

were marked as sick leave, and he was expected to return on November 23, 2009." Dkt. 33-18 at 3 (Hubbard Decl. ¶ 8).

Plaintiff did not return to work on November 23.  In late November or early December 2009, Plaintiff and Hubbard spoke on the telephone.  According to Plaintiff, the conversation occurred just before Thanksgiving, and Plaintiff called work from another inmate's illegal cell phone and informed Hubbard that he was incarcerated and that he would be released on December 12, 2009.  Dkt. 1 at 3; Dkt. 35 at 100.  In Plaintiff's telling, Hubbard responded that he "would deal with [Plaintiff] when [he] came back to work."  Dkt. 1 at 3; Dkt. 35 at 100.  According to Hubbard, however, the conversation occurred on or about December 2, 2009, and Plaintiff did not mention being incarcerated.  Dkt. 33-18 at 3–4 (Hubbard Decl. ¶¶ 11–13).  Rather, Plaintiff told Hubbard that he would return to work on December 14 and agreed to provide documentation supporting his absence.  *Id.*  Hubbard nonetheless "suspect[ed]" that Plaintiff was incarcerated "based on the combination of (1) the commotion in the background during [their] phone conversation and (2) [Plaintiff's] previous comments about [being on] probation."  *Id.* (Hubbard Decl. ¶ 12).  Hubbard e-mailed the Postal Service's Office of Inspector General ("OIG") on December 2, 2009, and asked Special Agent Joyce Younce to investigate Plaintiff's whereabouts.  *Id.* at 4 (Hubbard Decl. ¶ 14).

On December 3, 2009, the Ward Place Station received another medical excuse by fax, purportedly sent by Dr. Bharati from Johns Hopkins University.  Dkt. 33-4 at 11; Dkt. 33-18 at 4 (Hubbard Decl. ¶ 15).  In that letter, which was dated November 23, 2009, Dr. Bharati reported that Plaintiff "was seen in my office today for a follow-up appointment" and was advised "to continue physical therapy and return to work December 14, 2009 with no restrictions."  Dkt. 33-4 at 11.  Around December 14, 2009, Plaintiff returned to work.  Dkt. 33-18 at 4 (Hubbard Decl. ¶ 17).

4

**C. OIG Investigation**

The OIG investigated from December 8, 2009 to January 29, 2010.  Dkt. 33-4 at 1.  In a report issued on February 9, 2010, it confirmed that Plaintiff was in fact incarcerated from October 23, 2009 to December 10, 2009.  *Id.* at 3.  The report also recounts the OIG's unsuccessful attempts to locate Dr. Bharati.  Special Agent Younce searched the Postal Service's address locator for the address listed on the faxed medical excuses, but found no such address in Essex, Maryland.  *Id.* at 4.  Younce then drove to locations in Baltimore and Middle River, Maryland with the same street name and house number as the listed address, but did not find a doctor's office.  *Id.*  OIG staff also tried, unsuccessfully, to locate Dr. Bharati via Google, the doctors' directory at Johns Hopkins Medical Center, the American Medical Association, and a telephone number database, www.anywho.com.  *Id.*

A memorandum prepared by another OIG investigator states that in an interview conducted on January 27, 2010, Plaintiff maintained that he was "out sick October 23 to December 10, 2009."  Dkt. 33-4 at 31.  According to the memorandum, Plaintiff declined to discuss any specifics about his "medical problems" in the interview, but stated that since 2000 he had an ongoing problem with his ankle and that he had reinjured it by twisting it on the job.  *Id.* at 31.  The memorandum also explains that although Plaintiff "was uncooperative," he agreed to have his doctor contact Hubbard and to provide the doctor's name, telephone number, and address by January 29, 2010.  *Id.* at 32.

In February 2010, Hubbard informed OIG that he had not received any information from Plaintiff about Dr. Bharati.  Dkt. 33-18 at 4 (Hubbard Decl. ¶ 18).  Hubbard "was waiting for further news from the OIG before initiating any disciplinary action" against Plaintiff, but Hubbard was reassigned to a different postal station around March 2010.  *Id.* at 4–5 (Hubbard Decl. ¶¶ 19–20).  Consequently, Hubbard "played no role in issuing discipline to" Plaintiff, but

he later "learned that the OIG confirmed [his] suspicion that [Plaintiff] was incarcerated." *Id*. at

5 (Hubbard Decl. ¶¶ 21-22).

**D.  Pre-Termination Proceedings**

Supervisor Dickens received a copy of the OIG report in February 2010.  Dkt. 33-19 at 4

(Dickens Decl. I ¶ 12).  Dickens viewed Plaintiff's conduct described in the report as

"egregious" and initiated disciplinary proceedings.  *Id*. (Dickens Decl. I ¶ 16).  In accordance

with the collective bargaining agreement, Dickens conducted a "pre-disciplinary interview" on

April 21, 2010, at which he asked Plaintiff "about his whereabouts between October 23 and

December 10, 2009, and . . . provided an opportunity [for him] to explain his absence." *Id.* at 5

(Dickens Decl. I ¶¶ 17–19).  According to Dickens, Plaintiff "stated that he [had] provided

doctor's notes stating he had reinjured his ankle," and "never mentioned that he was

incarcerated." *Id.* (Dickens Decl. I ¶¶ 21, 23).  Plaintiff "then stated that [Dickens] had no need

to ask him anything about his absence," and he "refused to provide [Dickens] any additional

information." *Id*. (Dickens Decl. I ¶ 22).  For Dickens, the "interview confirmed that [Plaintiff]

had submitted fraudulent medical documentation, and his absence was unexcused." *Id.* (Dickens

Decl. I ¶ 24).  Dickens therefore decided to issue a notice of removal to Plaintiff.  *Id.* at 6

(Dickens Decl. I ¶ 25).

After reviewing the OIG report, Plaintiff's second-line supervisor, Rucker, concurred

with Dickens' decision to remove Plaintiff.  Dkt. 33-20 at 2–3 (Rucker Decl. I ¶¶ 8–10.)

According to Rucker, "[w]hile any one of [Plaintiff's] actions ([Absent Without Leave

("AWOL")], fraudulent medical documentation, or incarceration) would have been sufficient for

removal, the combination of all three made my decision to concur with the removal simple." *Id*.

at 3 (Rucker Decl. I ¶ 10).

On May 10, 2010, the Postal Service issued a Notice of Removal charging Plaintiff with (1) "Unacceptable Conduct" and (2) "Unacceptable Attendance/AWOL." Dkt. 33-6 at 1. The first charge was based on Plaintiff's failure to notify management about his arrest and incarceration from October 23, 2009 through December 10, 2009, and his submission of "fraudulent medical documentation" to support his absence. *Id.* The second charge stated that Plaintiff had failed to provide an acceptable reason for missing work in light of the results of the OIG's investigation and his pre-disciplinary interview. *Id.* at 2. Plaintiff was found to have violated several sections of the Employee and Labor Relations Manual, including those proscribing unacceptable, unscheduled absences and "criminal, dishonest, notoriously disgraceful, immoral, or other conduct prejudicial to the Postal Service." *Id.* The latter section states that "[c]onviction for a violation of any criminal statute may be grounds for disciplinary action . . . , including removal of the employee, in addition to any other penalty imposed." *Id.*

In a written response to the removal notice, Plaintiff asserted that he had told Hubbard and others at the post office that he was on probation, that he had to go to court on October 23, 2009, and that he might get incarcerated at that time. Dkt. 33-9 at 2–3. According to Plaintiff, he notified his supervisor and station manager "every time [he] had a legal problem," including "when [he] was arrested," they were "aware of [his] situation," and he "did not try to hide anything." *Id.* at 3. In addition, Plaintiff stated that he twisted his left ankle on October 22, 2009, after he returned from delivering mail. *Id.* Notwithstanding his scheduled court appearance the next day, Plaintiff expected to return to work the following Monday and, thus, "was going to get a doctor's excuse that would cover [him] until 10/26/09." *Id.* According to Plaintiff, a friend told him that he could call Dr. Bharati if he needed a doctor's excuse in a hurry. *Id.* at 4. Although "unsure about using a doctor" that he had "never met," Plaintiff knew that his two regular doctors "would have insisted that [he] come to see them before giv[ing]

[him] an [ex]cuse," but with Dr. Bharati, [Plaintiff] did not have to make an appointment." *Id*. Plaintiff claimed that that he was initially marked down as on sick leave because "Supervisor Dickens said he had to write something down," and that Plaintiff later told Hubbard that he was in fact incarcerated.  Dkt. 33-9 at 5–6.

The National Association of Letter Carriers ("NALC") pursued a grievance on Plaintiff's behalf.  On July 12, 2010, the Dispute Resolution Team issued a decision "concur[ring] that Management did have Just Cause to remove [Plaintiff] from the USPS."  Dkt. 33-7 at 3.  The Team found that "Management has provided convincing evidence that the [Plaintiff] acted as charged in submitting fraudulent medical documentation" and that "[t]his action justifies the severity of the discipline issued."  *Id*.  As a result, the Plaintiff was "removed from the USPS effective the date of this decision."  *Id*. at 1.

Rucker received a copy of the Team's decision on July 22, 2010.  Dkt. 33-20 at 3 (Rucker Decl. I ¶ 13).  He then escorted Plaintiff off the premises.  *Id*. at 4 (Rucker Decl. I ¶ 15).

**E.  Subsequent Proceedings**

Plaintiff pursued an administrative complaint alleging that he had been terminated on the basis of disability and in reprisal for prior EEO activity.  Dkt. 33-10 at 1.  The Equal Employment Opportunity Commission ("EEOC") rendered a final decision on May 9, 2013, in which it affirmed the holding of an EEOC Administrative Judge that (1) the Postal Service articulated legitimate, nondiscriminatory reasons for Plaintiff's termination and (2) Plaintiff failed to show that his termination was motivated by discrimination.  *Id*. at 3.

The parties hotly dispute the date on which the instant action commenced.  Plaintiff mailed the Court a letter on July 29, 2013, which Defendant contends improperly failed to contain the word "Complaint" in any caption.  Dkt. 33 at 47; Dkt. 33-11 at 9–16; Dkt. 33-22 at 8. On August 29, 2013, the Clerk of the District Court for the District of Columbia received a

"complaint" listing the caption of the case and an application to proceed *in forma pauperis*. Dkt. 1 at 200–201. On September 9, 2013, Plaintiff was notified that his documents were being returned as non-compliant with the Federal Rules of Civil Procedure and the Local Rules of this Court. *Id.* at 199. On September 20, 2013, the Clerk of Court received a complete complaint from Plaintiff, which included a caption and the allegations. Dkt. 1. The case was formally filed and docketed on October 8, 2013, upon the granting of Plaintiff's *in forma pauperis* application, which was dated September 19, 2013. Dkts. 1–2.

On October 14, 2014, the Court dismissed as untimely any potential claim brought under Section 301 of the Labor Management Relations Act. *See Bullock v. Donohoe*, 71 F. Supp. 3d 31, 34 (D.D.C. 2014). At the same time, the Court denied Defendant's motion for dismissal of Plaintiff's Rehabilitation Act claims on timeliness grounds and ordered limited discovery on whether the claims were timely. *Id.* The Court now addresses Defendant's Motion to Dismiss and for Summary Judgment on the Rehabilitation Act claims. Dkt. 33.

## II.  DISCUSSION

### A.  Motion to Dismiss

Defendant first contends that Plaintiff's claims should be dismissed because he failed properly to file a complaint (as distinguished from the letter sent to the Court on July 29, 2013) within 90 days of receiving a right-to-sue notice from the EEOC. Dkt. 33 at 7–11. The 90-day time limit is not a jurisdictional requirement, and thus the Court need not address whether Plaintiff has complied with it before turning to the substance of his claims. *See Colbert v. Potter*, 471 F.3d 158, 167 (D.C. Cir. 2006) (explaining that the 90-day limit imposed by Title VII, 42 U.S.C. § 2000e-16(c), is not jurisdictional); 29 U.S.C. § 794a(a)(1) (applying Title VII remedies, procedures, and rights, including the provisions of 42 U.S.C. § 2000e-16, to claims under § 501

of the Rehabilitation Act).[2]  In light of the factual dispute between the parties regarding the filing

of the complaint, and because the Court concludes that, in any event, Defendant is entitled to

summary judgment on the merits of Plaintiff's claims, *see infra* Section II.B., the Court declines

to reach the timeliness issue.

Second, Defendant contends that the Court should dismiss this action as a discovery

sanction.  Dkt. 33 at 11–12.  "[T]he extreme sanction of dismissal is warranted only when (1) the

other party has been so prejudiced by the misconduct that it would be unfair to require [the party]

to proceed further in the case, (2) the party's misconduct has put an intolerable burden on the

court by requiring the court to modify its own docket and operations in order to accommodate

the delay, or (3) the court finds it necessary to sanction conduct that is disrespectful to the court

and to deter similar misconduct in the future."  *Davis v. D.C. Child & Family Servs. Agency*, 304

F.R.D. 51, 61 (D.D.C. 2014) (alterations in original) (internal quotation marks omitted); *see also*

*Webb v. Dist. of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998).  Defendant points to Plaintiff's

delay in responding to a supplemental interrogatory, his "repeated refusal to provide timely

discovery," and his alleged "penchant for prevarication" as grounds for dismissal, Dkt. 33 at 11–

12,[3] but the Court concludes that even if Plaintiff engaged in such conduct, it is insufficient to

warrant such an extreme measure.  Defendant has not asserted that Plaintiff's conduct resulted in

any prejudice to it, nor did Plaintiff's conduct result in significant delay or "an intolerable burden

---

[2]  By contrast, administrative exhaustion is a jurisdictional prerequisite to a Rehabilitation Act claim.  *See Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006).  Here, there is no dispute that that requirement is met—that there has been a "'final disposition of [an administrative] complaint.' 29 U.S.C. § 794a(a)(1)."  *Id.* (alteration in original).

[3]  Plaintiff, for example, denied during his deposition that he had consumed alcohol "prior to coming here," Dkt. 33-21 at 38, but later acknowledged that "did drink a little beer earlier that day," Dkt. 33-15 at 5.

on the court." *Davis*, 304 F.R.D. at 62.  Consistent with the "judicial system's strong

presumption in favor of adjudications on the merits," *Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d

1469, 1475 (D.C. Cir. 1995), the Court declines to dismiss this case as a sanction for Plaintiff's

conduct during discovery.

## B. Motion for Summary Judgment

Turning to the merits, Defendant contends that she is entitled to summary judgment

because "Plaintiff cannot establish a prima facie case of retaliation," Dkt. 33 at 16, and because

Plaintiff has failed to put forth any evidence rebutting Defendant's legitimate, nondiscriminatory

explanation for Plaintiff's termination, Dkt. 33 at 18.  Summary judgment is appropriate when

"the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247–48 (1986).  "A fact is material if it 'might affect the outcome of the suit

under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535

F.3d 689, 692 (D.C. Cir. 2008) (quoting *Liberty Lobby*, 477 U.S. at 248).  "[W]hile summary

judgment must be approached with special caution in discrimination cases, a plaintiff is not

relieved of [the] obligation to support [his] allegations by affidavits or other competent evidence

showing that there is a genuine issue for trial." *Stewart v. White*, 61 F. Supp. 3d 118, 128

(D.D.C. 2014) (internal quotation marks omitted) (second alteration in original).

"Rehabilitation Act section 501 prohibits federal agencies from engaging in employment

discrimination against disabled individuals" and "instructs courts to use the same standards

employed in cases arising under the Americans with Disabilities Act [("ADA")]" to adjudicate

such claims. *Adams v. Rice*, 531 F.3d 936, 942–43 (D.C. Cir. 2008).  The Rehabilitation Act

also "provides a cause of action for retaliation pursuant to its incorporation of § 12203(a) of the

ADA, 42 U.S.C. § 12203(a), which prohibits employers from retaliating against an employee

because he or she has opposed an unlawful employment practice or made a charge or

participated in an EEO investigation or proceeding." *Marshall v. Potter*, 634 F. Supp. 2d 66, 73

(D.D.C. 2009). "Where, as here, a claim of discrimination or retaliation is based upon

circumstantial evidence, we analyze the claim under the burden-shifting framework set out in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)." *Kersey v. Washington*

*Metro. Area Transit Auth.*, 586 F.3d 13, 16 (D.C. Cir. 2009); *see also Woodruff v. Peters*, 482

F.3d 521, 528–29 (D.C. Cir. 2007) ("[W]e apply Title VII's *McDonnell Douglas* burden-shifting

framework to retaliation claims under the Rehabilitation Act when employers assert non-

retaliatory grounds for adverse employment actions."); *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C.

Cir. 1993) (explaining that *McDonnell Douglas* framework applies to claims under § 501 of the

Rehabilitation Act where the "employing agency asserts that it . . . discharged [the employee] for

reasons unrelated to the person's handicap"). Under that framework,

> [I]t is the plaintiff's burden to establish a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff establishes a prima facie case, the employer must then articulate a legitimate, nondiscriminatory reason for its actions. The plaintiff must then demonstrate that the employer's stated reason was pretextual and that the true reason was discriminatory.

*Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002) (internal citations omitted).

In cases, like this one, where the defendant comes forward with a legitimate, non-

discriminatory or non-retaliatory reason for the adverse employment action, consideration of the

prima facie case is pretermitted. *See Morales v. Gotbaum*, 42 F. Supp. 3d 175, 187 (D.D.C.

2014). As the D.C. Circuit has admonished in the analogous context of Title VII disparate-

treatment litigation, where "an employer has asserted a legitimate, non-discriminatory reason for

[its] decision, the district court need not—*and should not*—decide whether the plaintiff actually

made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of the Sergeant at*

*Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Rather, the Court considers

only whether Plaintiff has "produced evidence sufficient for a reasonable jury to find that the

employer's asserted non-discriminatory reason was not the actual reason and that the employer

intentionally discriminated against [him] on a prohibited basis," such as disability or retaliatory

motive. *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008); *see also Jones

v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) ("[T]hese principles apply equally to retaliation

claims . . . ."). The Court considers "all the evidence, which includes not only the prima facie

case but also the evidence the plaintiff offers 'to attack the employer's proffered explanation for

its action.'" *Jones*, 557 F.3d at 677 (quoting *Carter v. George Wash. Univ.*, 387 F.3d 872, 878

(D.C. Cir. 2004)).

Here, Defendant has asserted a legitimate, non-discriminatory and non-retaliatory reason

for her termination of Plaintiff's employment. Indeed, she has asserted two reasons, either of

which alone would have been sufficient to support Plaintiff's discharge under the Postal

Service's Employee and Labor Relations Manual: (1) Plaintiff engaged in "unacceptable

conduct" by failing "to notify management of [his] arrest and incarceration on October 23, 2009

through December 10, 2009," and by submitting "fraudulent medical documentation to [his]

supervisor for this time period"; and (2) Plaintiff had an "unacceptable" absence during the

period of time he was incarcerated. Dkt. 33-6 at 1 (Notice of Removal). The Notice of Removal

also notes that the Employee and Labor Relations Manual provides that "[c]onviction for a

violation of any criminal statute may be grounds for . . . removal"; that employees "must not

engage in . . . dishonest . . . or other conduct prejudicial to the Postal Service"; "that [e]mployees

are expected to maintain their assigned schedule," and "must provide acceptable evidence for

absences when required"; that "[f]ailure to be regular in attendance may result in . . . removal";

and that "employees who fail to report on scheduled days . . . are considered absent without leave

except in cases where actual emergencies prevent them from obtaining permission in advance"
and that "evidence of the emergency must be furnished later." *Id.* at 2–3.  In considering these
asserted justifications, the central "question is not whether the underlying [misconduct]
occurred," but rather "whether the *employer honestly and reasonably believed* that the
underlying [misconduct] occurred." *Brady*, 520 F.3d at 496 (emphasis in original).

Defendant has martialed a wealth of supporting evidence that Plaintiff's termination was
in fact based on the honest and reasonable belief of the deciding officials that Plaintiff committed
egregious violations of Postal Service policies regarding standards of conduct and unexcused
absences.  She has submitted, *inter alia*, declarations from the two supervisors who were
involved in the termination decision (Dickens and Rucker), a declaration from Plaintiff's prior
supervisor (Hubbard), the state court records of Plaintiff's incarceration, the medical excuses
submitted by Dr. Bharati during the time of Plaintiff's incarceration, records pertaining to OIG's
investigation of Plaintiff's absence and its failed attempts to locate Dr. Bharati, and the pertinent
provisions of its Employee and Labor Relations Manual.  Plaintiff, by contrast, has not produced
any competent evidence that could lead a reasonable jury to disbelieve the Defendant's
legitimate, nondiscriminatory reasons for firing Plaintiff.

Plaintiff's memorandum in opposition to Defendant's motion for summary judgment
makes three arguments that this case should proceed to trial, none of which establishes a genuine
issue of material fact.  First, Plaintiff asserts that Hubbard was aware that Plaintiff had filed EEO
complaints against him in the past and that he had also previously filed an EEO complaint
against someone named Jackie Cooks, who was Rucker's girlfriend at the time.  Dkt. 35 at 14–
16.  The prior EEO activity against Hubbard is immaterial.  Although Hubbard acknowledges in
his declaration that he was aware of Plaintiff's prior complaints against him, Hubbard was, at
most, indirectly involved in the termination of Plaintiff's employment because he left the Ward

Place Station shortly after the OIG finished its report but before Plaintiff's pre-disciplinary interview.  Dkt. 33-18 at 2–5 (Hubbard Decl. ¶¶ 5, 18–20).  Hubbard's uncontroverted declaration, moreover, states in categorical terms that he "played no role in issuing discipline to Mr. Bullock."  *Id.* at 5 (Hubbard Decl. ¶ 22).  That assertion is unrebutted.

As for the EEO activity against Cooks, no reasonable jury could find for Plaintiff on the retaliation claim based solely on the speculative assertion that this EEO complaint somehow affected the decision to fire Plaintiff.  Defendant offers uncontroverted evidence that any EEO activity involving Cooks would have occurred no later than 2005 when Plaintiff last worked under her supervision (five years before Plaintiff was fired), Dkt. 38-3 at 2 (Cooks Decl. ¶¶ 6-7); that Rucker's personal relationship with Cooks ended in 2006 (four years before Plaintiff was fired); and that, prior to this litigation, Rucker was unaware of any EEO complaints filed against Cooks (or indeed, of any of Plaintiff's prior EEO activity), Dkt. 38-1 at 2–3 (Rucker Decl. II ¶¶ 3–10).  Moreover, Rucker's role in the decision to terminate Plaintiff's employment was limited to concurring in Dickens's decision to issue a notice of removal, a decision that was also later ratified by Plaintiff's union.  Dkt. 33-20 at 2–3 (Rucker Decl. I ¶¶ 8–9); Dkt. 33-7 at 1.  And Cooks herself played no role at all.  Dkt. 38-3 at 2 (Cooks Decl. ¶ 6).  If such a remote connection between the filing of an EEO complaint and a subsequent termination decision were alone sufficient to create a material dispute of fact, it is difficult to conceive of any case in which the mere filing of an EEO complaint would not permit a plaintiff alleging retaliation "*automatically* [to] obtain a jury trial."  *Brady*, 520 F.3d at 496 (emphasis in original).

Next, Plaintiff claims that he did not personally submit the fraudulent medical documentation or fail to inform his employer about his incarceration, contrary to statements in the notice of removal.  Dkt. 35 at 17; Dkt. 33-6 at 1.  Plaintiff concedes, however, that he was incarcerated from October 23, 2009 to December 14, 2009, and that he did not visit Dr. Bharati.

Dkt. 25 at 27.  Plaintiff blames the fraudulent medical submissions on an unidentified friend

whose "intentions were [honorable]," Dkt. 35 at 73, and explains: "Yes I was going to get a

doctor slip from Dr. Bharati, who I thought was a real certified doctor[,] . . . for only two days.

When a friend found out that I was incarcerated, the friend took upon himself to fax the two

doctors' notes to my job without my knowledge," *id.* at 27.  Plaintiff also states that he notified

Hubbard that he was incarcerated in November.  Dkt. 35 at 20–21.

These arguments miss the point.  The question is not whether Petitioner actually engaged

in the asserted misconduct, but whether those who made the decision to fire him "honestly and

reasonably believe that" he did.  *Brady*, 520 F.3d at 496.  As to that controlling question, the

record is uncontroverted.  Todd Dickens, Plaintiff's direct supervisor, has offered uncontroverted

testimony that he issued the Notice of Removal based on "Plaintiff's incarceration and fraudulent

medical documentation" and his "extended absence without leave."  Dkt. 33-19 at 6 (Dickens

Decl. I ¶ 27).  He has further explained that "[a]ny one of the Plaintiff's actions (the 45 days of

AWOL, submission of fraudulent medical documentation, or the incarceration) would have

constituted sufficient grounds for his removal," *id.* (Dickens Decl. I ¶ 28), and that, "[b]ecause of

the severe nature of Plaintiff's misconduct, [he] felt that removal was the only reasonable

penalty," *id.* at 7 (Dickens Decl. I ¶ 33).  And, he provided uncontroverted testimony that he

"had no reason to believe that Mr. Bullock was not responsible for submitting the medical

documentation."  *Id.* (Dickens Decl. I ¶ 32).  Ricky Rucker, Plaintiff's second-line supervisor,

concurred in Dickens' decision to fire Plaintiff.  As he explained in his declaration, although any

one of the charges against Plaintiff would have been sufficient, "the combination of all three

made [his] decision to concur with removal simple."  Dkt. 33-20 at 3 (Rucker Decl. I ¶ 10).

Accordingly, even assuming that Plaintiff disclosed his incarceration to Hubbard and that

Plaintiff did not personally submit or solicit the submission of the fraudulent medical excuses—

assertions that are without competent evidentiary support—this would not constitute a basis on which a jury could reasonably conclude that Defendant had a discriminatory or retaliatory motive for firing Plaintiff.  Plaintiff has failed to identify any basis to doubt that Dickens and Rucker *honestly and with good reason believed* that Plaintiff engaged in criminal misconduct, was absent from work without leave, and submitted fraudulent medical documentation relating to his absence.  Indeed, in responding to Defendant's assertion of undisputed fact that "the Postal Service decision makers *believed* that Plaintiff had caused the October 23, 2009 note purporting to come from Dr. Bharati to be submitted to the Postal Service on his behalf," Dkt. 33 at 38 (SUMF ¶ 70) (emphasis added), Plaintiff candidly acknowledges that "I cannot dispute what the Postal Service decision makers *believed*," Dkt. 35 at 73 (Response to SUMF ¶ 70) (emphasis added).  It is that *belief*, however, that matters, and it is not the role of the Court to "'second-guess an employer's personnel decision absent demonstrably discriminatory [or retaliatory] motive.'"  *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).  "[T]he issue is not the correctness or desirability of the reasons offered [by the employer] . . . but whether the employer honestly believes in the reasons it offers." *Id.* (internal quotation marks and brackets omitted).  Thus, regardless of whether Plaintiff actually engaged in the asserted misconduct, he has not provided any evidence that even remotely suggests that Defendant's stated reasons for firing him were pretextual.

Finally, Plaintiff contends that "there were three others who worked at Ward [Place] Station who were incarcerated . . . at one time or another" who were not terminated.  Dkt. 35 at 26.  Plaintiff has not, however, produced any evidence to show that those individuals were similarly situated.  In contrast, Dickens and Rucker, both long-term Postal Service supervisors, aver that they were aware of no other employee who had missed 45 days of work due to

17

incarceration and submitted fraudulent medical excuses to conceal his or her whereabouts.  Dkt. 33-19 at 6 (Dickens Decl. I ¶ 30); Dkt. 33-20 at 3 (Rucker Decl. I ¶ 9).  Ruckers and Dickens also aver that during their tenures as supervisors at Ward Place Station, the three employees specifically named by Plaintiff never missed over a month of work without permission, never submitted false medical documentation, and, as far as they know, were never incarcerated.  Dkt. 38-1 at 1 (Rucker Decl. II ¶ 2); Dkt. 38-2 at 1–2 (Dickens Decl. II ¶¶ 1–10).

    In sum, the Court concludes that Plaintiff has produced nothing to rebut the overwhelming evidence that Defendant had a legitimate, non-pretextual reason to fire Plaintiff.

## CONCLUSION

    For the foregoing reasons, the Court concludes that Defendant is entitled to judgment as a matter law.  A separate order accompanies this Memorandum Opinion.


                                    /s/ Randolph D. Moss
                                    RANDOLPH D. MOSS
                                    United States District Judge


Date:  January 8, 2016